# MURPHY & cGONIGLE MEMO ENDORSED

A Professional Corporation

Email: sfeldman@mmlawus.com
Direct: 212.880.3988
Facsimile: 212.880.3998

1185 Avenue of the Americas
Floor 21
New York, NY 10036

June 17, 2020

**Via ECF**

The Honorable Kenneth M. Karas
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street, Chambers 533
White Plains, New York 10601-4150

Re: United States v. John Cicero, 20 Cr. 125 (KMK)

Dear Judge Karas:

I am counsel for defendant John Cicero in the above-referenced matter. For the reasons stated below, I write to respectfully request that Mr. Cicero be granted pretrial release on bail conditions or, in the alternative, temporarily released pursuant to 18 U.S.C. § 3142(i). Among the reasons warranting his release, Mr. Cicero has very limited criminal history, he is a lifelong resident of the Westchester county community, and he has long suffered from ██████ which now poses a serious threat to the health and safety of Mr. Cicero due to the COVID-19 pandemic.[1] We propose a bail package consisting of a $500,000 bond secured by the signatures of Mr. Cicero's parents and brother, plus $50,000 cash. We further propose that Mr. Cicero be subject to home detention with electronic monitoring, drug testing and treatment as determined by Pre-Trial Services, and that he be prohibited from ordering package deliveries or receiving package deliveries to his home or elsewhere. We are open to other conditions directed by the Court or suggested by the Government that would permit Mr. Cicero's immediate release.

### Background

Mr. Cicero is a 38-year-old life-long resident of the Westchester county area. Immediately prior to his arrest, Mr. Cicero worked as a freelance IT services provider. He

---

[1] Because this application and its attached supporting documents contain confidential personal health information regarding Mr. Cicero, the undersigned respectfully requests that the Court order that certain portions of the publicly-filed version of this application, the declaration of Shahin Cicero, and the exhibits to the declaration be redacted. On June 17, 2020, I spoke by phone with Assistant United States Attorney David Felton, who has no objection to the request to redact this application, the declaration and its exhibits. I have submitted a proposed redacted version along with the unredacted version to the Court and opposing counsel.

New York ♦ Virginia ♦ Washington, D.C.

attended college at SUNY Westchester and John Jay College where he studied criminal justice, and left around late 2007 to join the New York City Police Department ("NYPD"). He served for approximately two years before resigning in 2010. Mr. Cicero resigned from the NYPD after he assaulted a suspect wanted in relation to the shooting of a police officer. As a result, Mr. Cicero pleaded guilty to misdemeanor assault in 2011 and was ordered to perform community service, which he completed. Mr. Cicero has one other prior conviction for a disorderly conduct violation, for which he received a conditional discharge.

        As described further below, Mr. Cicero suffered from ███████ since his teenage years, and was ████████████████████████████████████. According to the U.S. Center for Disease Control and Prevention (the "CDC"), "People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19. COVID-19 can affect [one's] respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease." See People with Moderate to Severe Asthma: People Who Are at Higher for Severe Illness, Ctrs. for Disease Control and Prevention, *found at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited on 6/3/20).

        Mr. Cicero's parents live in Westchester county, in a cooperative apartment which they own, and he resides with them. His father is retired, and his mother works as a medical records supervisor in a health care facility. Mr. Cicero's brother, Chris Cicero, also resides locally in Manhattan. Chris Cicero owns and operates his own internet related business. Mr. Cicero does not currently possess a U.S. passport. He is not a frequent international traveler. His only travel abroad occurred several years ago when he accompanied his brother on a business trip.

### *Procedural History*

        In the instant matter, Mr. Cicero was arrested and initially appeared before the court on February 20, 2020. He is charged in the Indictment with one count of conspiring to distribute (i) 500 grams and more of a substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(b)(1)(A); and (ii) an unspecified quantity of gamma-butyrolactone ("GBL"), in violation of 21 U.S.C. § 841(b)(1)(C). Although the Pre-Trial Services Department recommended that Mr. Cicero be released on bail at the time of his initial presentment,[2] Judge Smith ordered Mr. Cicero detained based on a finding that he was both a risk of flight and danger to the community. Judge Smith concluded that Mr. Cicero received shipments of drugs at his parents' home, where he resided, and that even home incarceration would not stop him from receiving those deliveries. Judge Smith also concluded that the Government's evidence was strong.[3]

_____

[2]  Pre-Trial Services recommended a bail package consisting primarily of two Financially Responsible People, and supervision with drug testing.
[3]  At the time of Mr. Cicero's initial presentment, "the Court did not know and could not have known that" Mr. Cicero would be detained "at a time of a worldwide pandemic to which persons with asthma... have heightened vulnerability." United States v. Hernandez, No. 18 CR. 834 (PAE), 2020 WL 1684062, at *1 (S.D.N.Y. Apr. 2, 2020). These circumstances constitute new information "that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably

Hon. Kenneth M. Karas
June 17, 2020
Page 3 of 9

The parties appeared for an initial conference before Your Honor on March 3, 2020. Following that conference, on or about March 26, 2020, the Government produced a first batch of discovery contained on a one TB hard drive. Following a second status conference on May 7, 2020, the Government produced a second set of discovery on a 128 GB hard drive on or about May 11, 2020. According to the Government's statements to the Court at the May 7 conference, a third round of discovery will be provided sometime in the future, but the Government has not yet produced it. The parties are next scheduled for a status conference on July 9, 2020.

The discovery is extensive. It consists of months of audio of recorded calls from multiple Title III wiretaps. Additionally, it consists of more than 17 hours of recorded conversations pertinent specifically to Mr. Cicero involving conversations with a co-defendant by phone while she was in prison. It contains hundreds of photographs from searches of various locations. It also includes many video files and surveillance photos. In addition, it contains many documents such as records of electronic payments and shipments, and wiretap line sheets. It also contains a complete electronic forensic copy of one or more cell phones associated with Mr. Cicero seized by the Government.

In addition, the discovery includes certain physical items which the Government indicated are only available for in-person inspection. We understand that to include identification document-making equipment. According to the Government, Mr. Cicero utilized false identification documents and credit cards in order to, among other things, rent hotel rooms. Importantly, there is no claim that Mr. Cicero used false identification documents to travel outside the New York region or the United States.

### *Circumstances of Detention*

Following his initial presentment, Mr. Cicero has been detained at the Westchester County Jail ("WCJ"). Because he is a former police officer, he was subjected to lockdown for 23 hours per day since February in strict protective custody, which recently ended. While in lockdown, he received an hour or less time each day to shower and exercise. While he is no longer in 23 hours per day of lockdown, Mr. Cicero remains confined to a protective custody unit, the size of a classroom, completely cutting off his ability to access the WCJ facilities. Even in this protective custody unit, Mr. Cicero was recently punched in his eye socket by another inmate seeking to get retribution on the police. Mr. Cicero did not fight back when attacked.

In response to the COVID-19 outbreak, prison authorities have chosen to close the prison library where computer terminals for inmate use are located. No substitute procedures have been arranged. Normally, Mr. Cicero would be permitted to review the electronic discovery on a computer in the library. As a result, Mr. Cicero has been unable to review any of the electronic

___

assure the appearance of such person as required and the safety of any other person and the community," 18 U.S.C. § 3142(f), permitting the Court to reopen the bail hearing.

Hon. Kenneth M. Karas
June 17, 2020
Page 4 of 9

discovery provided directly to him by the Government.[4]  Defense counsel has printed from the electronic discovery hundreds of pages of materials and mailed those documents to Mr. Cicero. However, this has not permitted Mr. Cicero to review any of the key electronic discovery, such as audio and video recordings.  If Mr. Cicero remains in WCJ, it will take significant time for him to review the discovery once the law library is eventually reopened.

### *Medical Condition*



### Discussion

The Court should grant Mr. Cicero's application for bail for a myriad of reasons. With little criminal history and a lifetime spent in the community, there are surely terms and conditions that can be set to assure the safety of the community and Mr. Cicero's appearance for court. In normal circumstances, Mr. Cicero should not be detained pending trial. The current extraordinary circumstances exacerbate the need for Mr. Cicero's immediate release.

Among the bases to grant bail, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Mr. Cicero faces a heightened risk from the COVID-19 pandemic. As detailed below, courts have recognized the heightened risk posed by COVID-19 to ▓▓▓▓▓▓▓ as a sufficient basis to order a defendant's release.

In response to the COVID-19 pandemic, prison authorities determined to close the WCJ law library, cutting off access to the computers situated there for the federal inmates to review discovery. This prevents Mr. Cicero from reviewing the bulk of the Rule 16 discovery produced by the Government, leaving him unable to consider the evidence arrayed against him, and unable to assist defense counsel prepare his defense. Even when access to the law library is restored at some unknown date, Mr. Cicero will need significant time to review the extensive discovery in order to understand the evidence collected by the Government, and to work with defense counsel to prepare a defense (as will all of the other federal defendants detained at WCJ who will simultaneously need to access a limited number of computers) – thereby greatly extending the time before Mr. Cicero will be ready to assist in his defense so his case can proceed.

In addition, if not released, because jury trials have been halted pending the resolution of the pandemic, Mr. Cicero will be forced to wait in pre-trial detention for an extended period of

---

[4]  Since the library closure, the Government has not changed its methods of producing electronic discovery to the incarcerated defendants or the forms of materials provided to defendants even though it is aware that the inmates cannot review the Rule 16 materials.

Hon. Kenneth M. Karas
June 17, 2020
Page 5 of 9

time far beyond that in normal circumstances, extending the opportunity for COVID-19 to target Mr. Cicero, and subjecting Mr. Cicero to significantly longer detention than envisioned by our legal system. For these and additional reasons set forth below, Mr. Cicero should be released on bail conditions at this time.

### A. COVID-19 Risk Warrants Bail

The Centers for Disease Control warns that persons with "moderate to severe asthma are at higher risk of getting very sick from COVID-19." See People with Moderate to Severe Asthma: People Who Are at Higher for Severe Illness, Ctrs. for Disease Control and Prevention, *found at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited on 6/3/20). According to a study looking at U.S. patients with COVID-19, people with underlying health conditions like chronic lung disease may be at higher risk for hospitalization with COVID-19. See Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — U.S., Feb. 12 - Mar. 28, 2020, MMWR Morb Mortal Wkly Rep 2020; 69:382–386, *found at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm?s_cid=mm6913e2_w (last visited on 6/3/20).

Acknowledging the CDC's medical advice, courts in this district and around the country have recognized the heightened risk posed by COVID-19 to defendants with asthma, and ordered the release of those defendants:

> COVID-19 presents a heightened risk for incarcerated defendants… with respiratory… ailments. The Centers for Disease Control warns that persons with asthma… are at high risk of serious illness if they contract the disease. Further, the crowded nature of federal detention centers such as the MDC present an outsize risk that the COVID-19 contagion, once it gains entry, will spread. And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself. For these reasons… numerous courts, including this one, have ordered the temporary release of inmates held in pretrial or presentencing custody.

United States v. Butler, No. 19 Cr. 834 (PAE), 2020 WL 1689778, at *2 (S.D.N.Y. Apr. 7, 2020) (citations omitted).

Other courts have similarly determined that the risks posed by COVID-19 to those suffering from asthma warrant release from detention. See United States v. Norris, No. 17 Cr. 106 (SRU), 18 Cr. 243 (SRU) (D. Conn. Apr. 16, 2020) (finding defendant who "suffers from asthma and uses an Albuterol inhaler to treat his symptoms" is "unable to properly safeguard against infection," and concluding that "[defendant's] medical condition and current conditions of confinement constitute extraordinary and compelling reasons" for release), cited by United States v. Williams, 17 Cr. 121 (VAB), 2020 WL 1974372, at *3 (D. Conn. Apr. 24, 2020); United States v. Gorai, 18 Cr. 220 (JCM) (CWH), 2020 WL 1975372, at *3 (D. Nev. Apr. 24, 2020) (granting compassionate release to a 34-year-old defendant with asthma as the only listed

Hon. Kenneth M. Karas
June 17, 2020
Page 6 of 9

medical condition); United States v. Park, 16 Cr. 473 (RA), 2020 WL 1970603, at *3, *6 (S.D.N.Y. Apr. 24, 2020) (granting compassionate release to a 44-year-old defendant with asthma and immune-compromising diseases); United States v. Gileno, 19 Cr. 161 (VAB), 2020 WL 1916773, at *5 (D. Conn. Apr. 20, 2020) (granting immediate release to defendant who suffered from asthma and respiratory conditions that placed him at greater risk from COVID-19); United States v. Ben-Yhwh, Cr. No. 15-00830 LEK, 2020 WL 1874125, at *5 (D. Haw. Apr. 13, 2020) (ordering immediate release to home confinement for 73-year-old man suffering from Parkinson's Disease, asthma and diabetes "which substantially increase his risk of ICU admission and death if he contracts COVID-19"); United States v. Smith, 12 Cr. 133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020) (ordering immediate release where defendant's "age [62 years] and medical conditions—such as his asthma—place him at a higher risk for developing serious complications should he be exposed to COVID-19 while at the MDC or a halfway house, and would substantially diminish his ability to provide self-care within those environments"); United States v. Wen, 17 Cr. 6173 (EAW), 2020 WL 1845104, at *7 (W.D.N.Y. Apr. 13, 2020) (granting motion for compassionate release where, among other circumstances, the "[d]efendant suffers from asthma, placing him at an increased risk of falling seriously ill from COVID-19"); United States v. Tran, 08 Cr. 197 (DOC), 2020 WL 1820520, at *1 (C.D. Cal. Apr. 10, 2020) (granting immediate release based on defendant's "lifelong asthma condition" and concern over the spread of COVID-19 at the prison where he was incarcerated); United States v. McCarthy, 17 Cr. 230 (JCH), 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020) (granting immediate release to defendant suffering from chronic obstructive pulmonary disease, asthma, and other lung-related ailments); United States v. Hernandez, 18 Cr. 834 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) (stating "COVID-19 presents a "heightened risk for incarcerated defendants… with respiratory ailments such as asthma").

RedactedRedactedRedactedRedactedRedactedRedacted RedactedRedactedRedactedRedactedRedactedRedacted RedactedRedactedRedactedRedactedRedactedRedacted RedactedRedactedRedactedRedactedRedactedRedacted RedactedRedactedRedacted Accordingly, Mr. Cicero should be released on bail to minimize the severe risk to his health.

*B. While Detained, Mr. Cicero Cannot Adequately Assist in His Own Defense, and Any Resolution of this Matter Will Likely be Long Delayed*

In response to COVID-19, WCJ authorities chose to close the WCJ law library and prohibit access to the computers used by federal inmates to review Rule 16 discovery. This prevents Mr. Cicero from reviewing the bulk of the discovery produced by the Government – voluminous amounts of electronic evidence only reviewable on a computer – leaving him unable to consider the evidence arrayed against him, and unable to assist defense counsel prepare his defense. These restrictions implicate Mr. Cicero's Fifth Amendment right to access the courts and his Sixth Amendment right to counsel. Even when access to the law library is restored, Mr. Cicero will need significant time to review the extensive discovery in order to understand the evidence collected by the Government, and to work with defense counsel to prepare a defense, thereby greatly extending the time before Mr. Cicero will be ready to proceed.

Hon. Kenneth M. Karas
June 17, 2020
Page 7 of 9

As one court in this district observed, "[T]he obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason" for release. United States v. Stephens, No. 15 Cr. 95 (AJN), 2020 WL 1295155, at *3 (S.D.N.Y. Mar. 19, 2020). Cf. United States v. Williams, No. 3:19-CR-315-1 (VLB), 2020 WL 2988975, at *3 (D. Conn. June 4, 2020) (concluding that defendant's release was not necessary for preparation of his defense where defendant "has a copy of the discovery to review"); United States v. Cecrle, No. 2:12-CR-400-JAD-GWF, 2014 WL 31674, at *7 (D. Nev. Jan. 3, 2014) (concluding that defendant's release was not necessary where detention facility will allow defendant "up to 5 or 6 hours of [computer] terminal access per day" ensuring defendant "has a reasonable opportunity to assist his counsel in the preparation of his defense").

In addition, if not released, as jury trials have been halted pending the resolution of the pandemic, Mr. Cicero will be forced to wait in pre-trial detention for an extended period of time far beyond that in normal circumstances. This additional wait will extend the opportunity for COVID-19 to target Mr. Cicero, and subject Mr. Cicero to significantly longer detention than envisioned by our legal system.

The Second Circuit has cautioned that there are due process limitations on the length of detention, although there is no bright-line limit on the length of pretrial detention. United States v. Briggs, 697 F.3d 98, 101 (2d Cir. 2012), as amended (Oct. 9, 2012). Nevertheless, the Second Circuit has "stressed that very long detentions must be exceptional." Briggs, 697 F.3d at 103. "[F]or every set of circumstances, due process does impose some limit." Id.

We envision the likelihood that Mr. Cicero's trial could be delayed for an extended period of time. First, as described above, while months have elapsed since his arrest, Mr. Cicero has not been able to review any of the Government's voluminous electronic discovery because WCJ has cut off inmate access to all computers used to review discovery. In addition, not all of the discovery has even been produced by the Government.

Even when WCJ authorities permit the inmates to use the computers, there is likely to be a separate delay as all jury trials have been adjourned because of the public health emergency. Current trial ready criminal matters are now being delayed until at least the fall. In Mr. Cicero's case, a multi-defendant case where many of the defendants are detained and unable to even complete their review of the discovery, trial may not take place for a year or more from now. Extended detention for 15 months without trial may well implicate due process limits on the length of detention. See Briggs, 697 F.3d at 103 ("[W]e condemned as unconstitutionally excessive the detention of two defendants" who "had been held for fourteen months, and their trial, set for four months following the disposition of their appeal, was expected to last eight months more."). We respectfully submit that these circumstances necessitate that courts reconsider the standard calculations in determining whether defendants may be released on bail.

*C. Risk of Flight & Danger to the Community*

As referenced above, Mr. Cicero has little criminal history. It consists of a misdemeanor assault conviction from his time as a police officer, for which he received a conditional discharge, and a more recent disorderly conduct violation for which he also received a conditional discharge. While Mr. Cicero faces very serious charges in this matter, nothing about Mr. Cicero's criminal history indicates that he lacks the ability to control his behavior while out on bail. In addition, there are no allegations of Mr. Cicero's possession or use of firearms, or commission of violent acts in this matter or any other matter, apart from the assault he committed as a police officer. Nothing in the discovery produced by the Government alleges violent acts by Mr. Cicero, or the possession or use of weapons.[5] To the degree any of Mr. Cicero's behavior issues could be attributed to the use or abuse of drugs, Mr. Cicero will be subjected to drug testing and treatment.

At the time of his initial appearance, Judge Smith found that Mr. Cicero poses an ongoing danger to the community. She expressed concern that, as alleged by the Government, Mr. Cicero would continue to order packages of drugs for delivery to his parents' home for distribution to others. However, we have suggested that as part of any bail package, the Court prohibit Mr. Cicero from ordering any packages or having packages delivered to his parents' home. As his parents will be co-signers on his bond, and he will reside with them, Mr. Cicero's parents will both be highly motivated to ensure that he does not order and receive packages, and they will also have the ability to monitor the receipt of any packages as they reside together. In addition, by placing Mr. Cicero on home detention with electronic monitoring, Mr. Cicero would be unable to pick-up packages outside the home or distribute narcotics to others.

Contrary to Judge Smith's conclusion, there is no risk of flight and no doubt that Mr. Cicero will appear as required in court. As noted above, Mr. Cicero is a lifelong resident of the Westchester county area. Until his arrest, he resided with his parents in Bronxville, New York. Mr. Cicero has limited experience traveling outside the U.S. on one occasion, so he lacks overseas contacts to facilitate an escape. He does not possess a passport. As the fact that he lived with his parents through age 38 shows, it is clear he lacks the financial resources to fund a life on-the-run in the U.S. or overseas.

The Government highlighted that Mr. Cicero allegedly possessed identification document or credit card making equipment in his bedroom in his parents' apartment. As the discovery and the Government's statements indicate, fake IDs and credit cards were allegedly used to rent hotel rooms for parties. While the allegations certainly describe historical criminal conduct, they do not demonstrate the use of fake IDs or credit cards to facilitate domestic or international travel.

---

[5] At Mr. Cicero's initial appearance, the Government offered and relied heavily on a transcript in which a co-defendant excitedly discussed the prospect of being released from jail four months in the future, and her intent to make havoc when released, including robbing people. To the degree the co-defendant's bravado was serious (which is questionable when one actually listens to the call) and she planned to make havoc four months in the future, the call audio and transcript make clear that Mr. Cicero never agreed to participate in any robbery four months in the future or ever.

Indeed, the Government seized the alleged device making equipment it located in Mr. Cicero's bedroom making it impossible for him to use that equipment in the future.

In addition, in his prior interactions with the legal system, Mr. Cicero always appeared in court as required. Mr. Cicero's rap sheet shows one bench warrant issued and vacated the very same day he pleaded guilty in relation to the disorderly conduct violation. In that case, Mr. Cicero was standing in the courthouse hallway when his case was initially called, and his case was resolved at the second call. There is no history of any failure to appear.

## Conclusion

For all of these reasons, Mr. Cicero should be released on bail conditions at this time. We propose a bail package consisting of a $500,000 bond secured by the signatures of Mr. Cicero's parents and brother, plus $50,000 cash; that Mr. Cicero be subjected to home detention with electronic monitoring; drug testing and treatment as determined by Pre-Trial Services; and that he be prohibited from ordering package deliveries or receiving package deliveries to his home or elsewhere.

In ordinary times, the circumstances of Mr. Cicero's prior criminal history and court appearances, the nature of the offense including lack of firearms or violence, and the strict bail conditions proposed would warrant Mr. Cicero's release. However, these factors are combined here with the health threat of COVID-19 posed to Mr. Cicero resulting from his [REDACTED]; the fact that Mr. Cicero is unable to review any of the electronic discovery produced by the Government in order to aid in his own defense because WCJ cut off inmate computer access; and the likelihood that Mr. Cicero will not have his case resolved via a trial for a long time to come as a result of the pandemic. Taken together, these facts and circumstances necessitate that the Court order Mr. Cicero's immediate release on an appropriate bail package. We request the opportunity to be heard on this application in a remote conference in order to answer any questions the Court may have.

The Government is to respond to this application by 6/21/20.

So Ordered.

6/18/20

Respectfully submitted,

Steven D. Feldman

Declaration with Exhibits

cc: All Counsel (via ECF)